# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ANTHONY MCGRIFF, | |
| Plaintiff, | CIVIL ACTION NO. 1:22-cv-01547 |
| v. | (SAPORITO, J.) |
| MRS. COUSINS, | |
| Defendant. | |

## MEMORANDUM

Plaintiff Anthony McGriff, incarcerated at SCI-Huntingdon, proceeds *pro se* on an Eighth Amendment claim against defendant Jessica Tress (formerly named Jessica Cousins)[1] for deliberate indifference to his serious medical need. Both parties move for summary judgment. (Docs. 80, 84). Because the record shows a genuine dispute of fact as to whether Tress cancelled McGriff's medication for a non-medical reason, the Court denies summary judgment to both parties.

## I. BACKGROUND

McGriff proceeds on an amended complaint (Doc. 35), which

---

[1] The defendant's surname changed from Cousins to Tress while this litigation was pending. Although records of the relevant period identify the defendant as Cousins, the Court refers to the defendant using her current name.

initially named eight defendants and asserted various claims of retaliation, inadequate medical care, and unconstitutional conditions of confinement at SCI-Huntingdon. Pursuant to 28 U.S.C. § 1915(e), the Court permitted McGriff to proceed on an Eighth Amendment claim of "deliberate indifference to medical care" against Tress and dismissed all other defendants. *See* (Docs. 42, 43).

As relevant to the sole remaining claim, the complaint alleges as follows: McGriff suffers from bipolar disorder, depression, anxiety, and insomnia, for which he was prescribed Trazodone. On August 8, 2020, prisoners were allowed into common areas for the first time following an extended lockdown due to COVID-19. During the lockdown, medication was delivered to the prisoners' cells, but it would now be dispensed via "sick call," *i.e.*, prisoners would line up at a desk to receive it. McGriff collected his medication and wanted to ingest it in his cell as he had during the lockdown, because it made him sleepy. He was stopped and told that he had to ingest it in front of the nurses. Six correctional officers surrounded McGriff, one of whom reached for pepper spray. McGriff "step[ped] back, drop[ped] the meds on the desk," told a nurse that he was declining to take his medication, and returned to his cell.

On August 10, 2020, defendant Tress informed McGriff that she was discontinuing his prescription because "the nurse said you threw medication at her." McGriff disputed that version of events, but Tress "just avoided [McGriff's] questions." McGriff "tried to plead with [Tress] about side effects" from medication withdrawal, but Tress "did not want to hear it." In another meeting on September 2, 2020, McGriff told Tress that there are "side effects as well as withdrawal symptoms dealing with" Trazodone. Tress allegedly responded: "[T]hat does not happen[,] there['] s no side effects." McGriff alleges that his bipolar disorder, anxiety, and depression have "gotten wors[e]," and seeks monetary, declaratory, and injunctive relief.

Both parties now move for summary judgment (Docs. 80, 84), and McGriff has filed a renewed request for appointment of counsel. (Doc. 97). The motions are ripe for resolution.

## II.    Legal Standards

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment should be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it might affect the outcome

of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of material fact is "genuine" only if the evidence "is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248. In deciding a summary judgment motion, all inferences "should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Pastore v. Bell Tel. Co. of Pa.*, 24 F.3d 508, 512 (3d Cir. 1994). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion," and demonstrating the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant makes such a showing, the non-movant must set forth specific facts, supported by the record, demonstrating that "the evidence presents a sufficient disagreement to require submission to the jury." *Anderson*, 477 U.S. at 251-52.

In evaluating a motion for summary judgment, the Court must first determine if the moving party has made a *prima facie* showing that it is entitled to summary judgment. *See* Fed. R. Civ. P. 56(a); *Celotex*, 477 U.S. at 331. Only once that prima facie showing has been made does the

burden shift to the nonmoving party to demonstrate the existence of a genuine dispute of material fact. *See* Fed. R. Civ. P. 56(a); *Celotex*, 477 U.S. at 331. Both parties may cite to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motion only), admissions, interrogatory answers or other materials." Fed. R. Civ. P. 56(c)(1)(A).

## III.    MATERIAL FACTS[2]

### A. McGriff's Mental Health Issues

In 2016, before McGriff entered DOC custody, an examining neuropsychologist found that he had sustained significant head injuries and had "very extensive neuropsychological impairment[s]" in attention,

---

[2] McGriff did not respond directly to Tress's statement of material facts, and his own statement of facts does not properly cite to supporting evidence. McGriff's factual allegations, unless supported by evidence in the record, are not competent evidence at the summary judgment stage. *See* Fed. R. Civ. P. 56(c)(1). However, the Court has considered all the evidence the parties have submitted. *See* Fed. R. Civ. P. 56(c)(3) (in addition to properly cited materials, the court "may consider other materials in the record"). Where McGriff has not presented competent evidence to demonstrate a genuine dispute of material fact, Tress's fact statements are deemed admitted. *See* Fed. R. Civ. P. 56(e)(2); M.D. Pa. L.R. 56.1.

language, memory, and other areas, which collectively "constitute mild

dementia."[3] The neuropsychologist concluded that "[a]lthough he appears

to be a coherent and intelligent person, his neuropsychological deficits at

this time belie this appearance." He had been diagnosed with bipolar

disorder and ADHD and received medication for anxiety and depression.

*See* (Doc. 25 at 2-11, Doc. 80-1 at 13-17).[4] McGriff arrived at SCI-

Huntingdon in 2017, and his intake paperwork indicated a history of

bipolar disorder and a prescription for Trazodone. *See* (Doc. 63-4 at 26;

Doc. 86 at 39; Doc. 96-1 at 10).

At SCI-Huntingdon[5], McGriff's Trazodone prescription was

---

[3] On examination, McGriff ranked as "severely impaired"/"1st%ile" in visual selective attention, auditory selective attention, phonemic verbal fluency, "word finding[/]naming," semantic associative memory, inductive reasoning, and numerous other areas. *See* (Doc. 25 at 4-6).

[4] Although the version of the report submitted with McGriff's summary judgment motion is incomplete, a version that he previously filed appears to be complete. *See* (Doc. 25). Tress argues that the report is a "dated evaluation not performed for purposes of treatment but appearing to relate to his capacity to assist in his own criminal defense." Although the record casts doubt on some of the report's findings about McGriff's diminished capabilities, the Court does not weigh evidence or assess credibility at the summary judgment stage. *See Anderson*, 477 U.S. at 255.

[5] Tress has attached what she deems "relevant excerpts of McGriff's mental health records." *See* (Doc. 86 at 16-131).

continued through the August 7, 2020, incident, with only sporadic interruption. *See* (Doc. 63-4 at 63-75). Trazodone is an antidepressant that can cause drowsiness, and it was prescribed to be taken daily "at bedtime." In January 2020, McGriff reported that he was "generally doing well," his "medication compliance" was listed as 98.9%, and his Trazodone was renewed. On February 6, he again reported that he was doing well, and the mental health staff noted that he was "managing his [mental health] well via medication compliance." He had similarly positive reports on March 5, March 27, April 16, and April 29. After April 29, in-person psychiatry contacts and other prison activities were heavily restricted due to COVID protocols, but the record does not indicate any significant change in his condition. *See* (Doc. 86 at 16-38).

The record is unclear as to Tress's involvement in McGriff's care during this period. Tress states that she was "a part of [McGriff's] treatment team . . . in 2020." In a grievance appeal, McGriff alleged that he met with Tress "early" in 2020, during which they discussed Trazodone, its side effects, and the fact that he was "doing fine" but sometimes his anxiety and depression "got to him." (Doc. 63-2 at 6). However, the medical records do not document this meeting or otherwise

reflect Tress's direct involvement until the August 7, 2020, incident giving rise to McGriff's claim.

## B. Cancellation of Trazodone

On August 7, 2020, shortly before[6] 7:50 p.m., McGriff accepted his daily dose of Trazodone from the pill line and tried to take it back to his cell. When he was called back to the desk, McGriff said: "I have to take it to my cell and take it cause I pass out when I take it." Nursing staff told McGriff that he would not be allowed to do so because it was a psychiatric medication under a "DOT" order.[7] (Doc. 86 at 39, 131). McGriff claims that inmates had received medication on their own in their cells since March 2020 due to COVID protocols. (Doc. 63-1). Regardless, nursing staff told McGriff that he could either take his medication in front of the staff or refuse it "for the night." A nurse's report indicates that McGriff threw his medication and cup at the nurse and walked away, leading a

---

[6] McGriff contends that the incident occurred "around 7:30 p.m.," and a medical note describing the incident was entered at 7:50 p.m.

[7] The abbreviation "DOT" typically refers to "Directly Observed Therapy," meaning that the medication is to be administered dose by dose in the presence of health care staff. *See, e.g., McDonald-Witherspoon v. City of Phila.*, 481 F. Supp. 3d 424, 434 (E.D. Pa. 2020).

nearby officer to "pull his can of OC spray"; McGriff claims he "drop[ped the] meds on the desk" in a way that was not aggressive or abusive. *See* (Doc. 46-1 at 16-18; Doc. 63-1). Ultimately, it is undisputed that McGriff declined the medication for the night. Tress was not present, but was notified within minutes and immediately ordered a nurse to discontinue McGriff's prescription. (Doc. 86 at 131).

The next day, McGriff reported to receive his medication and learned that it had been discontinued. On August 13, Tress met with McGriff and his mental health counselor to discuss the issue. Tress's notes describe McGriff as "agitated, argumentative, and demanding." McGriff argued with Tress about the altercation, disputing the nurses' version of events, and describing the incident as a "one time" issue. McGriff said that he wanted to take the medication later at night because he "need[ed it] to sleep," but did not want to be "a zombie" earlier in the night. Tress told McGriff that the DOC would not prescribe psychiatric medication for insomnia, but "encouraged" him to buy melatonin from the commissary or receive instruction on "sleep hygiene." Tress then warned McGriff of "[in]appropriate behavior" towards staff, which made him "more agitated," and he yelled: "Get me a f*cking grievance! You're gonna

hear about this. I'm getting my f*cking meds back!" Tress found "no indication that [McGriff] needs to be [re]started on psychiatric medications at this time." After this meeting, the diagnosis of "unspecified depressive disorder" was removed from McGriff's record. *See* (Doc. 63-1 at 3-4; Doc. 86 at 39, 43).

On September 1, at a meeting to discuss his care, McGriff continued to argue with Tress: "You cut my meds. I brought these records from my attorney that say I have bipolar disorder. It shows that I've been on medication . . . you can't just take me off my medication." Tress told McGriff that "psychiatry could not accept" his records because they were not "obtained per DOC policy," and discussed his "inappropriate behavior" and "disrespectful approach" to his medication issues. Ultimately, Tress found "no indication that psychiatry needs to obtain any outside mental health records," and that McGriff had not identified any symptoms "that indicate medications need to be prescribed." She downgraded McGriff's mental health classification from Code C (for inmates "actively receiving mental health care") to Code B (for inmates with a "history of receiving psychiatric treatment [but] no current need" for such treatment) and cancelled all future psychiatric appointments.

*See* (Doc. 86 at 59-61).

In a grievance appeal (Doc. 63-2 at 6-7), McGriff describes a later meeting with Tress, which allegedly occurred on September 28, although the medical records do not document that meeting. In this document, McGriff describes telling Tress that he had "bipolar 2," which causes anxiety, depression, and hypomania, and that he had been prescribed Trazodone to "help with those symptoms." McGriff claims that he suffered "issues of withdrawal" from Trazodone for two months, and that he reported these issues to Tress but Tress responded that "trazodone [doesn't] give you withdrawal symptoms."

## C. Treatment After September 2020

In his subsequent interactions with psychology staff between October 2020 and January 2021, McGriff frequently denied any mental health issues but often refused to answer questions, sometimes berating or yelling obscenities at the staff. Although he asserted that his mental illness entitled him to a single cell without a roommate, the medical notes do not document any specific discussion of mental health complaints. Between January and October 2021, the record does not show any contact with psychology staff. On November 15, 2021, he was moved to the RHU

after a misconduct citation but denied any mental health concerns during each of seven daily encounters with medical staff from November 15-21.

However, on December 7, 2021, McGriff reported that he "wants to be seen about getting his medications back" due to anxiety and depression. Mental health staff told him he would not be referred to psychiatry unless he "works on coping skills and interventions to manage his symptoms." On January 6, 2022, he stated that he was "stressed and anxious," and was offered "a packet of interventions for anxiety, sleep, and stress." The next day, he claimed that the interventions were not working for him. He was "reminded how to access services if needed," although it is unclear if any further care was offered. On February 1, 2022, in the last medical note that appears in the record, he "denied any current concerns or need to talk." *See* (Doc. 86 at 121-130).

McGriff's more recent grievances and requests to staff describe continuing efforts to obtain medication. In November 2022, he submitted a request to mental health coordinator T. Sisto, claiming: "I've put in multiple request[s] over the months but to no avail. I suffer from bipolar disorder depression/anxiety[.] I'm in need of my medication[,] it's been a couple of years." On the same date, McGriff made a similar request to

Tress, which was answered on her behalf by PRN April Long: "Ms. [Tress] reviewed your request and your chart . . . [you] are not on the mental health roster to be seen by psychiatry. Ms. [Tress] asks that you work with PSS Lalli and if deemed appropriate she can do a referral to the clinic." (Doc. 80-2 at 10-11).

In May 2023, McGriff submitted another round of requests to Sisto and Tress, stating that Tress "offered some type of program, which was nice," but he was "in need of medication . . . can you help me, [I'm] climbing the walls." Sisto responded by scheduling McGriff for a June 1 meeting to discuss his request with the treatment team, and another nurse directed him to raise his concerns at the June 1 meeting. The record indicates that this meeting occurred as scheduled (*id.* at 6-7, 12), but the outcome is not described in the record.

## IV. DISCUSSION

McGriff proceeds on an Eighth Amendment claim against Tress based on deliberate indifference to his medical needs. For this claim, a plaintiff must show that (1) he had a serious medical need, (2) the defendant was deliberately indifferent to that need; and (3) the deliberate indifference caused harm to the plaintiff. *See Durham v. Kelley*, 82 F.4th

217, 229 (3d Cir. 2023). A plaintiff can demonstrate deliberate indifference by showing a "complete denial of medical care," *Pearson v. Prison Health Serv.*, 850 F.3d 526, 537 (3d Cir. 2017), or, "short of absolute denial," that a particular kind of necessary care was denied for a non-medical reason. *See Durmer v. O'Carroll*, 991 F.2d 64, 67-68 (3d Cir. 1993); *Monmouth Cnty. Corr. Institutional Inmates v. Lanzaro*, 834 F.2d 326, 346 (3d Cir. 1987).

A medical need is serious if it "has been diagnosed by a physician as requiring treatment" or if it is "so obvious that a lay person would easily recognize the necessity for a doctor's attention." *Palakovic v. Wetzel*, 854 F.3d 209, 227 n.23 (3d Cir. 2017) (quoting *Lanzaro*, 834 F.2d at 347). In this case, McGriff has presented evidence that he has or had a serious medical need: he was diagnosed with bipolar disorder and prescribed Trazodone prior to his incarceration, and that prescription was continued within the DOC for what Tress describes as "anxiety and insomnia."[8]

---

[8] Tress argues that the seriousness of a medical need "may be determined by reference to the effect of denying the particular treatment" (*Lanzaro*, 834 F.2d at 347); *i.e.*, that McGriff's condition after the cancellation of his Trazodone forecloses any inference that his needs were

*(continued on next page)*

Turning to deliberate indifference, Tress presents evidence that after the pill line incident, she evaluated McGriff and, finding that he had no apparent symptoms requiring Trazodone, discontinued the medication. Because a factfinder could conclude that this was a genuine medical judgment, the record precludes summary judgment for McGriff. However, the record also precludes summary judgment for Tress because a reasonable juror could find that the medication was in fact cancelled as punishment for his behavior in the pill line.

Tress offers a series of reasons for cancelling McGriff's medication, but none of them entirely align with the record. First, Tress claims that the medication was cancelled due to McGriff's "attempt to circumvent the penological procedure for its administration," *i.e.*, taking it out of view of the nursing staff, and "safety concerns related to potential medication hoarding."[9] To be sure, McGriff had no constitutional right to dictate the

---

"serious." As the Third Circuit has explained this principle, it simply means that the seriousness of the need can be inferred if the harm or potential harm is sufficiently severe. *See id.* at 347 (listing examples). Tress does not present authority showing that a condition meeting the standard of a serious medical need could be deemed not serious purely by reference to a treatment outcome.

[9] Tress's explanations appear internally contradictory. If, as Tress *(continued on next page)*

setting, timing, or dosage of his medication (*see, e.g., Norton v. Primecare Med. Servs.*, No. 1:22-CV-418, 2022 WL 17834068, at *5 (M.D. Pa. Dec. 21, 2022)), and it is not deliberate indifference to cancel a prescription out of genuine concern that a prisoner is concealing medication for an improper purpose. *See Robbins v. Lamas*, No. 3:13-CV-955, 2015 WL 225425, at *8 (M.D. Pa. Jan. 16, 2015); *Miller v. Beard*, 699 F. Supp. 2d 697, 709 (E.D. Pa. 2010).

However, McGriff presents evidence that these were not the reasons his medication was cancelled. McGriff disputes the nurses' version of the August 7 incident, and argues that taking the medication late at night, in his cell, was consistent with the procedure that had been established due to COVID protocols. Tress does not address McGriff's explanation, and there is evidence in the record that would support it, including that McGriff was restricted to his cell during COVID lockdowns, and that the

---

claims, the medication was only offered with nurses present, there was no apparent safety concern, because McGriff had no way to hoard the medication. The only way for a "potential safety concern" to arise was if, as McGriff contends, he was (or had been) permitted to take the medication out of view of the nurses. A factfinder could thus reasonably conclude either that the medication protocols were not as Tress describes, or that the medication was not cancelled for genuine safety concerns.

Trazodone was explicitly prescribed to be taken "at bedtime." McGriff had a documented record of "medication compliance" — including, presumably, following the nurses' instructions and consuming it at the appropriate time. A reasonable juror could conclude that the decision to cancel his prescription outright was not motivated by violations of the medication protocol or a genuine concern that he was hoarding[10] medication.

Tress also claims the medication was cancelled because McGriff did not need it, but that conclusion is difficult to explain given the medical staff's prior treatment of his mental health. Prior to August 7, McGriff's Trazodone was repeatedly renewed even though he reported no specific complaints. His many contacts with mental health staff in early 2020, allegedly including Tress, followed a consistent pattern: he reported that he was generally stable on the medication, the staff continued to acknowledge his "unspecified depressive disorder," and he continued to

---

[10] Tress's own notes do not suggest a concern that McGriff was "hoarding" in the sense of accumulating or distributing medication, but simply that he was attempting to take it in his cell later in the evening. *See*, *e.g.*, (Doc. 86 at 43 ("He stated the large dose 'makes him feel like a zombie' . . . Therefore, he was hoarding it in his cell to take closer to bedtime.")).

receive Trazodone.

However, on August 7, after the pill line incident, Tress cancelled the prescription immediately, without consulting or evaluating McGriff, even though it had repeatedly been deemed medically necessary. Later, after meeting with McGriff, Tress provided the justification that McGriff identified no specific symptoms warranting medication. But this was entirely consistent with McGriff's presentation of his illness before August 7: Tress does not explain[11] why the same information suddenly compelled the conclusion that he no longer needed medication. Ultimately, a reasonable juror could find that given the evidence of McGriff's mental health issues, and that his Trazodone was routinely renewed without specific complaints of symptoms, his lack of specific complaints after August 7 was not the true reason his prescription was cancelled.

Given the evidence described above, and the repeated focus in the medical notes on McGriff's "aggressive" or "abusive" behavior, the record

---

[11] Tress's explanation that the DOC does not prescribe psychiatric medication for insomnia is complicated by her own statements that the medical staff had been prescribing Trazodone "to aid his sleep," and that the medication was "appropriately administered" during this time. *See* (Doc. 86, ¶¶ 18, 58)).

could support a reasonable inference that Tress denied McGriff medication as punishment for his alleged abuse of staff, rather than genuine safety concerns or lack of medical need. *See Durham*, 82 F.4th at 230 ("non-medical reasons" included plaintiff's alleged "penchant for complaining and Defendants' descriptions of him as an 'asshole'"); *Miller*, 699 F. Supp. 2d at 703, 709 (plaintiff raised a plausible inference that a doctor cancelled medication "to punish him," despite the doctor's own notes that the plaintiff "interacted with the staff in a violent and degrading manner" and his condition was unchanged after the medication was cancelled); *see also Pearson*, 850 F.3d at 537 ("All that is needed is for the surrounding circumstances to be sufficient to permit a reasonable jury to find that the delay or denial was motivated by non-medical factors."). Although McGriff's complaints were ambiguous and inconsistent, he presents evidence that he suffered withdrawal symptoms for two months after his medication was cancelled, indicating a genuine dispute of fact as to whether he was harmed. *See, e.g., Rodriguez v. Brewington-Carr*, No. CIV.A. 98-442-GMS, 2002 WL 484714, at *3 (D. Del. Mar. 14, 2002) (because plaintiff "stated only that [his condition] was 'bothering' him and this term is ambiguous, a fact finder must determine

whether he actually suffered after treatment was refused").

Although Tress argues that she offered appropriate alternatives to McGriff, a reasonable juror could disagree. After cancelling Trazodone, Tress revoked McGriff's Code C classification of "actively receiving mental health care." Tress suggested melatonin and "sleep hygiene," but there is no evidence that these would have addressed bipolar disorder or "unspecified depressive disorder."[12] McGriff was periodically monitored, and was offered some mental health care, but that is not dispositive of deliberate indifference. *See Pearson,* 850 F.3d at 541 ("observation" of a patient can reflect informed medical judgment or a "non-medical motive"); *Durmer*, 991 F.2d at 67-68 (despite referrals to other doctors and "providing of some treatment," evidence could support an inference that a doctor denied necessary care for non-medical reasons). With due deference to the difficulty of providing mental health care in a carceral setting, particularly when an inmate is combative with staff, the record does not justify summary judgment for Tress on this claim.

---

[12] One medical note indicates that McGriff had "not been receptive" to trials of other psychiatric medications, but that was in reference to a review of older records. *See* (Doc. 86 at 39). There is no evidence that McGriff was offered any other psychiatric medication after Trazodone was cancelled.

## V.   CONCLUSION

For the reasons described above, both parties' motions for summary

judgment will be denied. An appropriate order follows.


Dated: July 21, 2025                 *s/Joseph F. Saporito, Jr.*
                                     JOSEPH F. SAPORITO, JR.
                                     United States District Judge